# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-3159

JINWOONG, INC.,

*Plaintiff-Appellee,*

v.

JINWOONG, INC.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98 C 4194—**David R. Herndon**, *Judge.*

_____

ARGUED SEPTEMBER 11, 2002—DECIDED OCTOBER 17, 2002

_____

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* This appeal from a diversity damages suit between identically named parties (and no, it is not a suit for divorce) started off on a very bad foot, with the appellant certifying in its statement of jurisdiction that it was appealing from a final judgment and the appellee certifying in its statement of jurisdiction that the appellant's statement was complete and correct. In fact the judgment order stated merely that summary judgment was being granted for the plaintiff, without specifying the amount of damages that was being ordered. Such a judgment is nonfinal and therefore (with immaterial excep-

tions) unappealable. *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737 (1976); *Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994). So we dismissed the appeal. The judge then entered a proper judgment awarding $1.2 million to the plaintiff, and the defendant filed a new notice of appeal.

Worse was to come. The parties as we said have the same name, but the plaintiff is a California corporation and the defendant a Korean corporation. (From here on in we'll call them "J-USA" and "J-Korea.") The briefs suggest that the only relation that has ever existed between them was that J-USA was the U.S. distributor of J-Korea's products. But we discovered at argument that when the suit was filed, J-USA was a subsidiary of J-Korea, though it was later sold. A suit by a subsidiary against its parent is sufficiently outré to warrant mention by the parties. We shall set the former relation between the parties to one side for a moment but come back to it.

The appeal arises from the following sequence of events, which we state in simplified form. J-Korea sold a tent, together with the stakes for fastening it to the ground, to American Recreation Products (ARP). It is unclear where J-Korea got the tent that it sold ARP, but the stakes were manufactured by an independent contractor in Korea that J-Korea hired for this task, according to specifications that ARP furnished it. J-Korea shipped the tent and stakes to J-USA, which packaged them and delivered them either to ARP or to ARP's customer, Wal-Mart. One of the stakes had been defectively manufactured, and it broke and caused a serious injury to a child named Amanda Cochran. That was in 1994. Shortly afterwards, she (by her parents) sued ARP, Wal-Mart, and a third firm (Kellwood), the role of which in this whole business is obscure and which therefore we shall ignore, in an Illinois state court.

The suit sought damages on grounds of breach of warranty, strict products liability, and negligence.

Two years into the suit (1996) Wal-Mart filed a third-party claim against J-USA. The Cochrans then amended their complaint to add as a defendant Jinwoong, Inc., described in the amended complaint as a domestic corporation that was however "the same entity" as J-Korea. This domestic corporation was in fact J-USA. J-Korea soon learned that J-USA was being sued both by Wal-Mart and by the Cochrans. But it made no effort to intervene. J-USA says that it tried to implead J-Korea but was rebuffed by the court; the record is muddy on this issue. Although J-Korea did not receive formal notice of the claims against J-USA until much later, it is apparent from an e-mail in the record and other evidence that J-Korea, though not impleaded or otherwise formally notified, learned about the claim against J-USA soon after it was filed.

In 1998 the Cochrans' suit was settled after they obtained summary judgment against J-USA on liability. J-USA agreed to pay them $1.2 million and then brought this diversity suit against J-Korea, seeking indemnity for the amount of the settlement. It is from the belatedly entered judgment for that amount that J-Korea is appealing.

Indemnity is another name for insurance, and it is common for the parties to a contract to provide that in the event that one is held liable the other shall indemnify it for the consequences. For example, contracts between authors and publishers invariably require the author to indemnify the publisher should the latter be held liable for defamation contained in the author's book. The underlying principle is that the party that is in the better position to avoid liability is given an incentive to do so by being made responsible for the consequences. *McMunn v.*

*Hertz Equipment Rental Corp.*, 91 F.2d 88, 91 (7th Cir. 1986); cf. Marvin A. Chirelstein, *Concepts and Case Analysis in the Law of Contracts* 10 (3d ed. 1998). But even if the parties fail to include an indemnity provision in their contract, if it is apparent that they would have done so had the point occurred to them the courts will read it into their contract unless it is disclaimed. Contract completion is a standard function of common law courts. *Harold Wright Co. v. E.I. DuPont De Nemours & Co.*, 49 F.3d 308, 310 (7th Cir. 1995); *Wisconsin Real Estate Investment Trust v. Weinstein*, 781 F.2d 589, 593 (7th Cir. 1986); Lisa Bernstein, "Social Norms and Default Rules Analysis," 3 *S. Cal. Interdisciplinary L.J.* 59, 62 (1993). It reduces transaction costs and gives the parties an approximation to what, if they were omniscient, they would have provided respecting every possible contingency that might arise in the course of performance of the contract.

For indemnity to be thus "implied" in a contract, the Illinois cases require (and it is Illinois common law that all agree governs the substantive issues in this diversity suit) that the parties must have already had a relationship when the tort giving rise to the liability occurred—for remember that the function of the doctrine of implied indemnity is to fill out the parties' contract; it is not to create a contract where none existed. In addition, the party on whom the duty to indemnify is sought to be imposed must have been in some (though often an attenuated) sense "at fault" and the other party blameless though liable—that is to say, only *strictly* liable, by virtue of respondeat superior, implied warranty, strict products liability, or some other legal principle that imposes liability regardless of fault. E.g., *Frazer v. A.F. Munsterman, Inc.*, 527 N.E.2d 1248, 1251-52 (Ill. 1988); *Kerschner v. Weiss & Co.*, 667 N.E.2d 1351, 1355-56 (Ill. App. 1996). Obviously the fact

that the party seeking indemnity was sued and settled rather than litigating to the death does not establish blame and thus refute his right to indemnity. *Richardson v. Chapman*, 676 N.E.2d 621, 631 (Ill. 1997); *Faier v. Ambrose & Cushing, P.C.*, 609 N.E.2d 315, 316 (Ill. 1993).

It is by virtue of the requirement of a preexisting relation that the parties' failure to disclose their corporate affiliation (which did not dissolve till after this suit was brought) so startles. Obviously they had a preexisting relation: one was owned by the other! Yet J-Korea denied in its brief that there was any preexisting relation, and J-USA said only that the two companies had a supplier-distributor relation, J-USA's role being to import the goods from Korea and market them in the United States. J-Korea may have denied the relationship in an effort to deny one element of the Illinois test for indemnity, while J-USA may have ignored the relationship lest its existence make us think that they were indeed "the same entity" so that the fault of J-Korea should be attributed to J-USA. Another possibility, however, is, as we shall see, that the preexisting relation was not the right kind from the standpoint of indemnity doctrine. Still, the lawyers should have been more forthcoming.

A further question about the corporate relation is whether it renders the suit collusive. We think not. J-USA was a subsidiary but (we were told at argument without contradiction) not a wholly owned one, so its board of directors had obligations to minority shareholders, especially in a case that involved a conflict with the parent; it may also have had obligations to creditors who by virtue of the principle of limited liability could not look to the parent to pay J-USA's debts. One obligation of J-USA to its minority shareholders was to enforce any right of indemnity that the law gave it, or rather not to refuse to enforce it

merely because the right was against its parent. Cf. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720, 723 (Del. 1971); *Case v. New York Central R.R.*, 204 N.E.2d 643, 645-46, 656 (N.Y. 1965); *Palley v. McDonnell Co.*, 295 A.2d 762, 765 (Del. Ch. 1972). The obligation was honored. J-USA having dutifully bought insurance that funded the settlement with the Cochrans, the insurance company became the subrogee of J-USA's indemnity claim and is, we understand, controlling this suit. J-Korea is insured by another insurance company, which is controlling the defense.

So the suit is not collusive and let us move to the merits. As we said, because implied indemnity is meant to fill a gap in the parties' contract there has to be a preexisting relation in the nature of contract and there was here: J-USA was J-Korea's U.S. distributor. The corporate relation itself was not the preexisting relation that the cases require; if the corporations though affiliated were not dealing with each other, imposition of implied indemnity would be an end run around limited corporate liability, which with immaterial exceptions applies even between affiliated corporations. That is, if *A* sues *B*, a subsidiary of *C*, *B* would not by virtue of the parent-subsidiary relation have a right to indemnity from *C*. The law does not attribute responsibility for the torts of a subsidiary to its parent, let alone regard the parent as the real wrongdoer and the subsidiary as liable merely under some theory of strict liability. Such a theory of indemnity would be upside down, since *C*, the parent, would have been an entirely passive participant in the events giving rise to *A*'s suit against *B*.

There is a more difficult question concerning the relative blame of our like-named parties. When two parties are both at fault, even if not equally, the doctrine that per-

mits a readjustment of liability in accordance with relative fault is contribution rather than indemnity. Indemnity is for "when the cheapest way of avoiding a careless accident is for one party to take *all* the precautions." *Hillier v. Southern Towing Co.*, 714 F.2d 714, 720 (7th Cir. 1983) (emphasis added). J-Korea fastens on the fact that the Cochrans' amended complaint charged J-USA with negligence. But it is apparent from the wording of that pleading and the further proceedings in the state court that the Cochrans had only an imperfect idea of the relation among the different Jinwoongs—hence the "same entity" claim. In fact, no evidence ever emerged that J-USA did anything except package and deliver the tent and its stakes, or that the defect was introduced in, exacerbated by, or should have been discovered and corrected in the course of the packaging and delivery function performed by J-USA.

A trickier question is whether J-Korea itself was at fault, since it did not manufacture the defective stake or provide the specs for it, but instead transmitted ARP's specs to an independent contractor whom J-Korea hired to manufacture it. There is evidence, however, that J-Korea culpably failed to detect its subcontractor's failure to manufacture the stake according to the specifications furnished J-Korea by ARP and forwarded by J-Korea to the subcontractor. The failure was culpable because J-Korea monitored and inspected the manufacture of the stakes and also inspected and tested the stakes, and there is no suggestion that a careful inspection at either stage would have failed to discover the defect. The failure was therefore negligence and a distributor whose only liability is strict liability is entitled to indemnity from a negligent supplier. *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.*, 123 F.3d 675, 684 (7th Cir.

1997); cf. *Frazer v. A.F. Munsterman, Inc.*, *supra*, 527 N.E.2d 1248, 1251-52; *Kerschner v. Weiss & Co.*, *supra*, 667 N.E.2d at 1355-56.

It is true that J-Korea's negligence was not at issue in the Cochrans' suit. That case was settled, apparently on the basis of J-USA's strict liability. J-Korea was not a defendant and its negligence was irrelevant. This point has been obscured by J-Korea's charge that J-USA took a dive in the Cochrans' suit knowing (or hoping) that it could lay off the expense of settlement on J-Korea, and that J-USA should have impleaded J-Korea or at least formally notified it of the Cochrans' suit and given it a chance to defend its interest. It is here that the analogy between contractual indemnity and formal insurance is closest. Ordinarily an insurance company insists on controlling the suit against its insured to protect its stake, and to that end insists on prompt notification of the suit. All that is set out in the insurance contract. But when as in this case indemnity is not sought on the basis of an insurance contract or some other contract of indemnity, no formalities are prescribed (for there is no contract to prescribe formalities and no statute to do so either, as we are dealing with a common law doctrine) or are required. The only question is whether the party seeking indemnity gave the other party (or at least the other party had) a fair opportunity to protect its interests. Due process requires no less, but no more either. See *Atlantic Richfield Co. v. Interstate Oil Transport*, 784 F.2d 106, 111, 113 (2d Cir. 1986); *Burke v. Ripp*, 619 F.2d 354, 357-59 (5th Cir. 1980); *Jennings v. United States*, 374 F.2d 983, 985-86 (4th Cir. 1967).

The requirements of due process were satisfied here, if barely. J-Korea learned of Wal-Mart's and the Cochrans' claims against J-USA shortly after they were made, and under Illinois law it could have intervened in the suit at

that time. See 735 ILCS 512-408(a); *Freesen, Inc. v. County of McLean*, 659 N.E.2d 411, 414 (Ill. App. 1995); *Moore v. McDaniel*, 362 N.E.2d 382, 388-89 (Ill. App. 1977); *City of Chicago v. Zik*, 211 N.E.2d 545, 546 (Ill. App. 1965). That would not have been too late to protect itself from the consequences of what it claims to have been J-USA's repeated dropping of the ball in the defense of the claims. Therefore the failure of formal notice whether by impleader or otherwise is not a defense to J-USA's claim for indemnity.

Although J-Korea thus cannot complain about J-USA's having settled the case, there is still the question whether J-Korea was negligent or otherwise blameworthy relative to the blameless J-USA. J-Korea's failure to intervene in the state suit cannot be thought to have resolved, or excused the district court in J-USA's indemnity suit (this suit) from having to resolve, that issue. For had J-Korea intervened in the Cochrans' suit, it is doubtful, to say the least, that the court would have determined whether J-Korea had been negligent—its negligence would have been irrelevant to J-USA's or any of the other defendants' liability to the Cochrans—unless J-USA had filed a third-party complaint against J-Korea. Doubtless J-USA would have done so had J-Korea been a party; that is why J-USA tried to implead it, to make it a party. But for reasons that are obscure, the attempt failed and as a result J-Korea's culpability was not determined—in that suit. But in this suit, J-USA presented evidence—the evidence we summarized earlier—that J-Korea had indeed been negligent in failing to detect the defect in the tent stake. J-Korea presented no counter evidence.

The district court did not, however, make an explicit finding that J-Korea had been negligent. All it found was "a qualitative distinction" between J-Korea's conduct and

that of J-USA that favored the latter. "Qualitative distinction" is not a very satisfactory standard, because it is so vague. But what the term, like the "active-passive" formula also found in indemnity cases, is gesturing toward is the fact that, although as we said earlier indemnity is allowed only when the party against whom indemnity is sought is "at fault," the requisite "fault" may consist of nothing worse than having been responsible in a merely causal sense for a product defect. Negligence is not required. A retailer or other distributor of a product who had absolutely nothing to do with its manufacture, and is held strictly liable to a customer injured by a defect in the product solely by virtue of doctrines of implied warranty or strict products liability, can still obtain indemnity from the manufacturer, on the theory that the latter, even if not negligent, made the defective product and so in a sense caused the defect. *Texaco, Inc. v. McGrew Lumber Co.*, 254 N.E.2d 584, 588 (Ill. App. 1969); *Schneider National, Inc. v. Holland Hitch Co.*, 843 P.2d 561, 581 (Wyo. 1992). The manufacturer is better able than the distributor to prevent the defect, maybe just by curtailing output if greater care in manufacture would not be cost justified. More important (because it usually is uneconomical to achieve zero-defect output), the manufacturer is in a better position to estimate the likelihood and cost of accidents due to defects in his product and to insure against such mishaps. This point is illustrated by the "vendor's endorsement," a common provision in a manufacturer's liability insurance policy that extends coverage to his distributors. *Hartford Fire Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 280 F.3d 744, 745-46 (7th Cir. 2002).

A further wrinkle here, however, is that J-Korea did not manufacture the defective stake. Supposing it hired an entirely reputable firm to manufacture it, why should it

be thought in a better position to have avoided the accident than J-USA or even to have estimated the likelihood of an accident and insured against it better than J-USA could have done? But we need not try to answer this question. J-Korea devotes only a sentence to denying that it was negligent or otherwise blameworthy relative to J-USA, and that is not enough discussion to preserve the issue for appellate review. *Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1192 (7th Cir. 1999); *United States v. Berkowitz*, 927 F.2d 1376, 1383-84 (7th Cir. 1991); *Karibian v. Columbia University*, 14 F.3d 773, 777 n. 1 (2d Cir. 1994).

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—10-17-02