# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-1126 & 02-1210

MIZUHO CORPORATE BANK (USA),

*Plaintiff-Appellee,*

v.

CORY & ASSOCIATES, INC.,

*Defendant-Third Party Plaintiff-Cross-Appellant,*

v.

SWETT & CRAWFORD OF ILLINOIS, INC. (f/k/a INSURANCE BROKERS SERVICE, INC.),

*Third-Party Defendant-Appellant,*

v.

TRAVELERS INDEMNITY COMPANY,

*Third-Party Defendant-Cross-Appellee.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5827—**Ronald A. Guzmán**, *Judge.*

———————

ARGUED DECEMBER 5, 2002—DECIDED AUGUST 29, 2003

———————

Before BAUER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Insurance is meant to cushion the blow caused by a disaster; it is supposed to be part of the solution, not part of the problem. In this case, however, the contest is over who was responsible for inadequacies in the insurance policy itself, and who must bear the uncovered losses. In general terms, this litigation arose out of the bankruptcy proceeding of the under-insured party, Cyberstar and Caribbean Communications (CCC). One of CCC's creditors (International Bank of Japan, or IBJ[1]) sued the retail insurance broker (Cory & Associates, or Cory) that had procured the policy, and it in turn impleaded the wholesale broker (Insurance Broker Services, Inc., or IBSI) and the ultimate insurer (Travelers Indemnity Company, or Travelers). One of the issues we are considering on appeal concerns the effect of a settlement between IBJ and Cory in the main action on the eve of trial. The district court ruled that this settlement resolved all issues conclusively with respect to Cory's alleged responsibility for the expensive mishap, and it therefore limited the trial to the question whether there was a fiduciary relationship between Cory and IBSI. The jury decided that there was, and thus stuck IBSI with the responsibility of paying the entire amount (some $20 million) reached in the settlement agreement. IBSI has appealed, claiming that this was error. The district court should not have so restricted the trial, and we therefore remand for further proceedings. The second major point concerns the correctness of the district court's decision to grant summary judgment in favor

---

[1] After the arguments in this case, International Bank of Japan changed its name to Mizuho Corporate Bank. For convenience, this opinion will continue to refer to this party as International Bank of Japan, or IBJ.

of Travelers. We affirm the court's ruling that Travelers was entitled to summary judgment.

## I

At the heart of this case is a simple but expensive communication failure. In early 1995, CCC retained Cory to set up insurance coverage in connection with CCC's impending purchase of a cable television operation in the U.S. Virgin Islands. Cory initially attempted to arrange coverage directly, but ultimately it turned the placement over to IBSI, which it thought would be better able to make sophisticated placements of the sort CCC needed. IBSI, which had a long-standing relationship with Travelers under a "Wholesale Broker Agreement," immediately identified Travelers as one potential underwriter for the requested coverage. Under that agreement, IBSI was authorized to undertake a variety of tasks on behalf of Travelers, including the solicitation of applications, the collection of premiums, and the holding of funds on behalf of and as a fiduciary of Travelers. Furthermore, the agreement provided for the payment of commissions to IBSI. The agreement did not, however, authorize IBSI to issue insurance binders and specifically disavowed any agency relationship between the two entities.

Over the course of several months, Cory and IBSI negotiated the terms and conditions of the requested coverage with at least two different insurance carriers, including Travelers. IBSI obtained several price quotations, and the parties passed the information up and down the chain of command. Thus, the price quotations issued by Travelers went first to IBSI, then to Cory, and finally to CCC. Ultimately, CCC assented to the terms of the Travelers policy and, speaking through Cory, gave IBSI instructions to bind. IBSI, after consultation with Travelers, responded with copies of a placement note.

The coverage negotiated by IBSI and Travelers became

effective on July 31, 1995. Six weeks later, Hurricane Marilyn swept through the U.S. Virgin Islands and did substantial damage to CCC's newly purchased cable facilities. When CCC attempted to recover from Travelers for the damage to the Caribbean facilities, a critical misunderstanding came to light. CCC thought that Cory, on its behalf, had entered into an insurance contract with Travelers with coverage of nearly $8 million; Travelers took the position that the IBSI-brokered policy set a cap on coverage at $2.5 million. Travelers ultimately paid CCC $2.5 million; the more than $5 million shortfall forced CCC into bankruptcy. A liquidation followed in April 1996, in which all CCC stock and claims were assigned to IBJ, one of CCC's principal lenders.

Although a detailed post-mortem of the coverage dispute is unnecessary for the purposes of the present appeal, an understanding of the possible reasons for the miscommunication may help to shed light on the analysis to come. One possible source of the problem was that Cory and IBSI negotiated the terms and conditions of the Travelers coverage, but at no point did CCC, Cory, or Travelers communicate directly with one another. Instead, IBSI remained the middleman throughout. In addition, at critical points IBSI took documents prepared by Travelers and incorporated their substance into its own documents, which it then used to communicate terms and conditions to Cory. As a result, the critical terms and conditions of the insurance coverage moved up and down the chain in different document formats. Finally, Travelers did not deliver the final paper policy to CCC until several weeks after the hurricane. In short, the parties were not, either literally or figuratively, on the same page. Another possible reason for the miscommunication was that the postponement of CCC's acquisition of the Caribbean-based cable facilities necessitated two separate rounds of bids from prospective insurers. Prior to the delay in the facilities acquisition, a competing insurer

had quoted a premium of $100,000 for $5 million in coverage. The ISBI-communicated premium from Travelers of $115,005 might have seemed to reflect coverage of the nearly $8 million that Cory thought it had requested and that CCC thought it was getting.

In August 1997, IBJ filed suit against Cory on behalf of all lender banks as assignee of CCC, claiming negligence, breach of fiduciary duty, breach of contract, and negligent misrepresentation. In turn, Cory filed third-party complaints against IBSI and Travelers. The portion of the third-party complaint that was directed against IBSI closely resembled IBJ's amended complaint against Cory. The first three of the five IBSI counts were specifically labeled "contribution" and included theories of negligence (Count I), breach of fiduciary duty (Count II), and negligent misrepresentation (Count III). The remaining two counts against IBSI contained no such labels and included theories of breach of fiduciary duty (Count IV) and breach of contract (Count V). The portion of the third-party complaint directed against Travelers sought reformation (Count VI) and raised theories of breach of contract (Count VII), tortious breach of contract (Count VIII), and negligence based on agency principles and *respondeat superior* (Count IX).

After more than a year of litigation, Travelers moved under FED. R. CIV. P. 12(b)(6) to dismiss the remaining claims Cory was asserting against it. The district court granted the motion with respect to the reformation claim, but it denied at that time to resolve the breach of contract and *respondeat superior* theories. Travelers had better luck more than two years later when it moved for summary judgment on the remaining counts. At that point, in an order dated May 10, 2001, the court granted summary judgment in favor of Travelers, reasoning that Cory lacked the requisite standing for the breach of contract claims because it could not plausibly claim status as a third-party beneficiary of the

Travelers-CCC insurance contract and that there was no agency relationship between IBSI and Travelers that could support a theory of *respondeat superior* liability.

On May 18, 2001, with trial rapidly approaching, IBJ and Cory reached an agreement settling IBJ's claims. The settlement agreement fixed the total amount of IBJ's claims at $20,367,519. It contained a complicated formula for the satisfaction of that claim by Cory, whereby a graduated percentage of the money recovered by IBJ from IBSI would be allocated back to Cory as a credit against the $4 million it had agreed to pay to IBJ under the settlement agreement, up to a maximum of $4,375,000. Under the terms of this agreement, a large recovery by IBJ against IBSI would actually produce a net gain to Cory of $375,000. It is this part of the settlement that IBSI has labeled a "kickback" provision.

IBSI objected to the settlement on reasonableness grounds and moved to dismiss the claims assigned to IBJ by Cory as part of the settlement agreement for failure to state a claim. The district court granted partial relief in a June 6 order, which dismissed all but two claims. The court first noted that Cory had not pursued Counts I and III, which it concluded were both barred anyway by the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/1 *et seq.* As for Count II, there was no problem under the Joint Tortfeasor Act because as a breach of fiduciary duty claim it did not fall under that statute. The court found in IBSI's favor, however, because the Illinois Insurance Placement Liability Act (IPLA), 735 ILCS 5/2-2201(b), which applies to fiduciary duty claims against all insurance "producers," barred the claim. This necessarily entailed a finding that Count II stated a claim for indemnity and that it arose after the January 1, 1997, effective date of the IPLA.

The district court found that the IPLA bar did not apply to Count IV, because it was not really an indemnity claim.

This implied that the Count IV claim accrued prior to the effective date of the IPLA and thus had to be tried, as did Count V. The court concluded that both Counts IV and V of Cory's third-party complaint were proper under FED. R. CIV. P. 14(a), since the rule permits the defendant-third-party plaintiff (here, Cory) to assert a claim against some-one (*i.e.*, IBSI) who is or may be liable for "all or part of the plaintiff's claim against the third-party plaintiff." The court rejected IBSI's claim that only Cory's professional liability insurer, as subrogee of Cory's claims, could bring the third-party complaint at issue. The court thus upheld the overall settlement agreement and dismissed Cory from the action with prejudice.

IBJ and IBSI proceeded to trial on the breach of fiduciary duty and breach of contract theories. But the trial was not what IBSI had expected. At the final pre-trial conference, the court decided that the issues of Cory's fault, proximate cause, and damages were no longer open to contest. A proximate cause instruction, according to the district court, was not necessary because "there is an indemnification type of relationship here." The district court ruled that damages would be fixed at $20,367,519, as stipulated in the IBJ-Cory settlement agreement. Asked only to find whether a fiduciary relationship existed between Cory and IBSI, the jury returned a verdict in favor of IBJ, as Cory's assignee. The court then entered judgment for IBJ on December 17, 2001, in the precise amount of the settlement. This appeal followed.

## II

Our resolution of the IBJ-IBSI portion of this case hinges on the characterization question that has dogged the proceedings throughout: after the settlement between IBJ and Cory, was the only remaining question in the case the issue

of IBSI's duty to indemnify Cory for its (implicit) payment to IBJ, or was the question whether IBSI had breached any fiduciary duty to IBJ's predecessor CCC still open to contest?

The consequences of the choice between these two alternatives are enormous. First, it determines when the claim arose. Depending on when the claim accrued, Cory and IBSI are either entitled or not entitled to protection under IPLA, which explicitly immunizes insurance producers like IBSI and Cory from fiduciary duty claims arising after its effective date. And most importantly, the proper characterization defines what issues should have been submitted to the jury. We take those points in turn.

Under Illinois law, a general (*i.e.*, non-indemnity) claim accrues when all elements are present and a party can invoke the aid of the court. See *Draper v. Frontier Ins. Co.*, 638 N.E.2d 1176, 1180 (Ill. App. Ct. 1994). Cory claimed that it incurred legal fees and expenses in defense of IBJ's claims as early as the fall of 1995 and thus its claim accrued at that time. IBJ and Cory did not settle their part of the dispute until May 18, 2001. Indemnity claims, in contrast, do not accrue until the main action has been resolved via judgment or settlement. See *Anixter Bros. v. Cent. Steel & Wire Co.*, 463 N.E.2d 913, 918 (Ill. App. Ct. 1984).

IBJ argues that the *Anixter Bros.* rule was modified by the later Illinois Supreme Court decision in *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530 (Ill. 1989). There, the Illinois Supreme Court stated that an indemnification claim accrues when "the indemnitee either has had a judgment entered against him for damages, or has made payments *or suffered actual loss.*" *Id.* at 539 (emphasis added). Under that test, according to IBJ, Cory's claim accrued in 1995 regardless of how we characterize Count IV, so long as Cory can prove that it incurred costs at that time. But the Illinois Supreme Court itself has had more to

say since *Gerill Corp.* was decided. In *Guzman v. C.R. Epperson Construction, Inc.*, 752 N.E.2d 1069, 1075 (Ill. 2001), it cited with approval the exact language used in *Anixter* that places the time of accrual of an indemnity claim at the point at which a judgment or settlement occurs. Moreover, the *Guzman* court noted that allowing an indemnity claim to accrue prior to settlement or judgment would have the perverse effect of requiring third-party complainants to "file numerous anticipatory claims well before they are sued, even if such litigation might later be unnecessary because the original plaintiff does not sue." *Id.* at 1075 (internal quotation marks and citations omitted). If, therefore, Count IV is properly viewed as an indemnity claim (and no one doubts that it is governed by Illinois law), then it accrued in May 2001.

That late accrual date would be enough to dispose of IBJ's assigned claim altogether. IPLA took effect on January 1, 1997. That statute explicitly immunizes insurance providers such as IBSI and Cory from "civil liability under standards governing the conduct of a fiduciary or a fiduciary relationship . . . ." 735 ILCS 5/2-2201(b). But the Act is of no help to IBSI if IBJ is correct that the claim accrued earlier than 1997.

We turn, therefore, to the central point: the proper characterization of Count IV. We begin with the language of the complaint, following the rule that the plaintiff is the master of its own litigation. Reading Cory's third-party complaint as a whole, we see that it specifically applied the label "Contribution" to each of the first three counts, but not to Count IV or the other remaining theories. Count IV is entitled simply, "Breach of Fiduciary Duty to Cory—IBSI." Taking Cory at its word, therefore, it was apparently raising only a normal claim of a breach of fiduciary duty. *See, e.g.*, *Indiana Ins. Co. v. Machon & Machon, Inc.*, 753 N.E.2d 442, 446 (Ill. App. Ct. 2001) (refusing to re-characterize a

claim as an indemnity claim where the word "indemnity" was "[c]onspicuously absent" from the complaint, save in the *ad damnum* clause in each count of the complaint).

Beyond this, as the district court noted, a separate part of the third-party complaint (Count II) much more clearly raised a claim for indemnification. There is no reason to think that Cory was raising a completely redundant theory of indemnification in Count IV, rather than pleading in the alternative under the related breach of fiduciary duty concept. This is so even though there is an obvious factual and legal overlap between the two theories. Cory has asserted throughout that it acted at the direction of IBSI, or in reliance on misrepresentations made by IBSI, and that it (Cory) believed throughout that it was acting properly. There is generally nothing wrong with alternative pleading, which is all that this complaint has done.

We conclude, as the district court did, that Count IV was exactly what Cory said it was: a general claim for breach of fiduciary duty. We also agree with the district court that the claim accrued in the fall of 1995, well before the effective date of the IPLA, when Cory hired counsel to defend against the original complaint brought by IBJ. The court explained that Cory could have sued IBSI at that time for breach of contract and fiduciary duty once legal fees and expenses were incurred. IBSI's principal response is that there is no record evidence that Cory in fact incurred attorney's fees or expenses in 1995. But the record points to enough evidence of earlier expenses to support the district court's decision on this point. For example, Cory offered at a pre-trial hearing to call Patrick Jean-Baptiste (of Cory) to testify that Cory did in fact hire investigators and a lawyer in 1995 and 1996. The district court declined the invitation, noting that it did not "see the need to establish actual damages [in]curred at that point." IBJ's opposition to IBSI's motion for judgment as a matter of law also mentions the

retention of investigators and counsel, putting the information before the district court, albeit in a post-trial motion. The breach of fiduciary duty claim accrued prior to the effective date of the IPLA, and IBSI is thus not entitled to the automatic exemption from liability for breaches of fiduciary duty afforded by that statute.

The point at which we diverge from the district court is whether it was correct to allow the jury to decide only whether a fiduciary duty existed and to keep from it the issues of Cory's own fault, proximate cause, and damages. In coming to its decision that the settlement agreement between IBJ and Cory conclusively resolved all issues in the IBSI litigation except for the question whether IBSI owed a fiduciary duty to Cory, the district court went astray by relying on a line of cases that is rooted in the insurance or indemnity context. The critical fact in those cases was the insurer's breach of a duty to defend and the consequences that flowed from that breach. See, *e.g.*, *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927 (7th Cir. 2002) (insured software company brought suit against its insurer for breach of duty to defend and indemnify after the insurer refused to reimburse the insured for the cost of its settlement in a trademark infringement suit); *Vitkus v. Beatrice Co.*, 127 F.3d 936 (10th Cir. 1997) (employee lawsuit against a former employer, self-insured for D&O liability insurance, for refusal to defend); *United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226 (Ill. App. Ct. 1994) (insured asbestos manufacturer sought declaratory judgment as to policy coverage by insurer); *St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 298 N.E.2d 289 (Ill. App. Ct. 1973) (indemnification claim by retailer against manufacturer of tire that caused vehicular accident). Here, we have nothing of the sort: IBSI owed no duty to defend either Cory or IBJ. All three parties were instead ordinary adversaries in ordinary litigation.

Furthermore, even if Cory's fiduciary duty claim might be susceptible to characterization as an implied indemnity claim (and, in turn, even if the claim was somehow not barred by IPLA), Illinois law would not have regarded the IBJ/Cory settlement as precluding IBSI's ability to prove Cory's fault. This is because Cory and IBSI were at all relevant times merely brokers working under a contract to provide brokerage services to Travelers and CCC and never stood in an insurer-insured relationship to one another. This means that any indemnity claim Cory brought against IBSI would have to be an implied indemnity claim rather than a pure indemnity claim.

Implied indemnity claims arise where the parties have failed to include an indemnity provision in an agreement, and there is reason for a court to read such a provision into the agreement. *Jinwoong, Inc. v. Jinwoong, Inc.*, 310 F.3d 962, 965 (7th Cir. 2002); see also *Am. Nat'l Bank & Trust Co. v. Columbus-Cuneo-Cabrini Med. Ctr.*, 609 N.E.2d 285, 287-88 (Ill. 1992). "The underlying principle is that the party that is in the better position to avoid liability is given an incentive to do so by being made responsible for the consequences." *Jinwoong*, 310 F.3d at 965; see also *McMunn v. Hertz Equip. Rental Corp.*, 791 F.2d 88, 91 (7th Cir. 1986); *Hillier v. S. Towing Co.*, 714 F.2d 714, 720 (7th Cir. 1983). But while insurance and pure indemnity claims frequently center on the insurer's duty to defend, implied indemnity actions lie only where one party is in some sense "at fault," and the other party is blameless though liable—typically because of strict liability, *respondeat superior*, implied warranty, or some other legal principle that imposed liability regardless of fault. See *Jinwoong*, 310 F.3d at 965. A claim of implied indemnity under Illinois law arises only where the indemnitee (here, Cory) was guiltless with respect to the underlying tort. See *Columbus-Cuneo-Cabrini Med. Ctr.*, 609 N.E.2d at 287-88; *Frazer v. A.F. Munsterman*, 527 N.E.2d 1248, 1251 (Ill. 1988); *Kerschner v. Weiss & Co.*, 667

N.E.2d 1351, 1355-56 (Ill. App. Ct. 1996). By its nature, the settlement agreement between IBJ and Cory could not have established Cory's blamelessness vis à vis IBSI, a stranger to that agreement.

Finally, IBJ suggests that the truncated trial proceedings can be justified by reference to traditional principles of issue preclusion. But for a variety of reasons this is wrong. Perhaps the most obvious is that issue preclusion applies, under the law of Illinois, only to questions that were "actually litigated," see *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990); *DuPage Forklift Serv., Inc. v. Material Handling Servs., Inc.*, 744 N.E.2d 845, 849 (Ill. 2001); *Am. Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000), and settlements do not count as "actual litigation," see *Rockford Mut. Ins. Co. v. Amerisure Ins. Co.*, 925 F.2d 193, 198 (7th Cir. 1991). Furthermore, principles of preclusion are not pertinent until the first lawsuit has been concluded and a second, separate proceeding is underway. Within a particular suit, the correct doctrine to consider is law of the case. Even from that perspective, however, there was no judicial determination about Cory's responsibility.

Our decision with respect to the proper treatment of Count IV makes it unnecessary for us to consider IBSI's objection to the original settlement between Cory and IBJ. Because a jury will decide on remand whether IBSI is liable to Cory, and if so to what extent, any ultimate judgment will not be affected by the amount or the terms of the settlement.

## III

We next address Cory's cross-appeal from the summary judgment in favor of Travelers on its breach of contract and

*respondeat superior* negligence claims. We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Cory and drawing all reasonable inferences in its favor. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 921 (7th Cir. 2001).

With respect to the contract claim, the district court ruled that Cory did not have a legally cognizable interest in the insurance agreement between Travelers and CCC. As a third party, Cory could recover only if "the contract [was] undertaken for the plaintiff's direct benefit and the contract itself . . . affirmatively make[s] this clear." *Caswell v. Zoya Int'l, Inc.*, 654 N.E.2d 552, 554 (Ill. App. Ct. 1995) (internal quotation marks and citation omitted). We agree that Cory had to show that Travelers and CCC intended in their contract to confer a benefit on Cory.

The insurance contract between Travelers and CCC does not even mention Cory, let alone affirmatively state that it was undertaken for Cory's direct benefit. Cory argues, however, that this court's decision in *Prince v. Royal Indemnity Co.*, 541 F.2d 646 (7th Cir. 1976), would allow it to recover. But *Prince* is easily distinguished from Cory's situation. *Prince* stands for the proposition that an insured who tries to assign a property insurance policy to a third party, but fails to complete the assignment because it did not get the insurer's consent, retains an insurable interest in the property sufficient to recover under the policy. See *id.* at 650. The relationship between a retail and a wholesale broker, and each of their connections with the insured party and the insurer, are entirely different. Cory was never an insured or even a potential insured under the policy issued by Travelers, and thus it cannot rely on *Prince* to support its case. The district court properly dismissed Cory's breach of contract claim against Travelers, because it had no legal interest in the terms of the ultimate insurance agreement.

Cory next contends that the district court erred in find-

ing that IBSI and Travelers lacked the necessary agency relationship to obtain relief under a *respondeat superior* theory of liability. In Cory's view, the record would support a finding that Travelers deliberately used IBSI to communicate with CCC and that Travelers, pursuant to the Wholesale Broker Agreement, authorized IBSI to engage in various agent-like activities on its behalf. These facts, in turn, Cory argues, are enough to establish vicarious liability under Illinois law.

The district court relied on a four-part test that the Illinois courts have created for determining whether an insurance broker is acting on behalf of the insured, the insurer, or both, under which it must consider (1) who called the intermediary into action; (2) who controls its actions; (3) who pays the intermediary; and (4) whose interests the intermediary represents. See *Moone v. Commercial Cas. Ins. Co.*, 112 N.E.2d 626, 629 (Ill. App. Ct. 1953); see also *A&B Freight Line, Inc. v. Ryan*, 576 N.E.2d 563, 566 (Ill. App. Ct. 1991); *Krause v. Pekin Life Ins. Co.*, 551 N.E.2d 395, 399 (Ill. App. Ct. 1990); *Roby v. Decatur Steel Erectors, Inc.*, 375 N.E.2d 1355, 1359 (Ill. App. Ct. 1978). Another Illinois case mentions factors such as "an agent's fixed and permanent relationship to the company he represents, conduct inconsistent with an agency relationship with a client, whether the client first approached the person, and whether the person dealt directly with the insurance company." *Northtown Warehouse & Transp. Co. v. Transamerica Ins. Co.*, 507 N.E.2d 189, 192 (Ill. App. Ct. 1987). Using the four-part test, the district court found that there was no agency relationship between IBSI and Travelers.

We agree. The record shows that it was Cory that initially approached IBSI and called IBSI "into action" by giving IBSI instructions to secure a quote from various insurers, among them Travelers. Cory also controlled IBSI both by directing IBSI to secure the initial price quotes from

insurers and by giving final instructions to IBSI to procure the actual policy from Travelers. It would be absurd to say that Travelers controlled IBSI, since IBSI remained free to the very end to negotiate with other insurers and to recommend other insurers to Cory and CCC. IBSI represented the interests of Cory and not Travelers. In fact, IBSI was explicitly attempting to wrest from Travelers the lowest possible price quote to take back to Cory and CCC. True, the existence of a commission relationship between IBSI and Travelers suggests that there were countervailing incentives in terms of price competition, but this is not enough standing alone to establish an agency relationship. See *Golden Rule Ins. Co. v. Michely*, 555 N.E.2d 1047, 1050-51 (Ill. App. Ct. 1990) (finding no agency relationship where broker-insurer agreement provided, among other things, for payment of commissions for placements); 12 AM. JUR. 2D BROKERS § 42 (stating that the rendering of a commission alone is not enough to establish agency).

Assuming, therefore, that *Moone* represents the authoritative Illinois law on the subject, the district court properly found that IBSI was a broker that sought out price quotes for clients by canvassing a range of possible insurers, rather than an agent with an "fixed and permanent relationship" to any particular insurer. Perhaps recognizing this, Cory argues in the alternative that the *Moone* test does not preclude recourse to traditional agency principles, and that its claims come within two established exceptions to *Moone*.

Illinois courts have found that the *Moone* test is inapplicable where there is an agency agreement that explicitly grants a broker the power to bind the insurer—in short, where there exists actual (express) authority. In *Zannini v. Reliance Ins. Co.*, 590 N.E.2d 457 (1992), the Illinois Supreme Court held that the existence of an agency agreement that gave the broker the authority to bind the insurer rendered unnecessary resort to the four-part test in *Moone*.

*Id.* at 463. The agreement in *Zannini* explicitly provided that the broker was an "agent" and had the authority to "bind coverage and execute contracts in accordance with the guidelines furnished from time to time by the Company or as authorized by the Company with respect to specific risks." *Id.* at 463. Under *Zannini*, Cory cannot prevail. The Wholesale Broker Agreement that governed the relations of IBSI and Travelers granted IBSI authority to do a variety of things—solicit applications for insurance, collect premiums, be paid commissions by Travelers, and hold funds in behalf of and as fiduciary of Travelers—but expressly withheld from IBSI the authority to bind Travelers. Thus, the first exception to the *Moone* test on which Cory attempts to rely is inapposite.

A second context in which Illinois courts have departed from *Moone* is where an insurer uses a broker to perform particular services and thereby vests the broker with apparent authority to act on behalf of the insurer. In such situations, an insurance company may be estopped to deny the agency of the broker. See *Empire Fire & Marine Ins. Co. v. Faith Truck Lines, Inc.*, 533 N.E.2d 441, 443-44 (Ill. App. Ct. 1988); *Ledbetter v. Crudup*, 449 N.E.2d 265, 267 (Ill. App. Ct. 1983). That, however, is not our case. The Illinois Supreme Court's decision in *State Security Insurance Co. v. Burgos*, 583 N.E.2d 547 (Ill. 1991), provides a useful contrast. There, an insurer tried to deny a claim from an insured because the insured had submitted its claim notice to the insurer's broker, rather than the insurer itself. The Illinois Supreme Court found for the plaintiff and held that the insurer had vested the broker with apparent authority based on a course of dealing. *Id.* at 552, 554. The Court rested its decision on at least three aspects of the insurer-broker relationship, including the insurer's use of the broker as a "conduit" for delivering policies, the billing and collection of premiums, and the mailing of notices regarding cancellation, renewals, or premium changes. *Id.* at 549-50,

552. The Court also seized upon language on the declarations page of the actual paper policy designating the broker as the insurer's "representative" and including the words "Agent or Broker—," as well as deposition testimony from an employee of the insurer who stated that he had received notice of claims from both insureds and brokers alike in the past. *Id.* at 552-54.

In the present case, although Travelers relied exclusively on IBSI for communication of policy information during the negotiation phase, it did no more. Unlike the *Burgos* situation, where the intermediary role played by the broker continued long after the procurement process was completed, IBSI's role was far more limited. Under Illinois law, as *Burgos* makes clear, procurement—which presumably includes price quotations and the sort of go-between communication provided by IBSI—cannot establish agency through apparent authority and a course of dealing. A decision on the facts of Cory's case would represent, at a minimum, a vast expansion of *Burgos*, and one that we believe would be inconsistent with the lines the Illinois courts have drawn. Such an outcome would transform all brokering into an agency relationship and all provision of brokerage services into a source of *respondeat superior* liability. We respectfully leave such a major change in the law to Illinois courts.

Last, Cory tries to save its case by arguing that Travel-ers ratified the statements of the IBSI representatives and that Travelers and CCC entered into an oral contract of insurance with liability limits of $7,667,000. Neither theory has merit. In order for a ratification to occur, Travelers must have known of the miscommunication or otherwise reviewed the placement note as executed by IBSI, believed it was ambiguous or otherwise unclear, and yet did nothing to correct or clarify the misleading language. Here, the record shows that the documents reaching Travelers consistently

set a $2.5 million cap on liability. The record evidence thus can support only the conclusion that whatever misunderstanding created the shortfall in coverage was internal to the communication between IBSI, Cory, and CCC, and that Travelers believed from start to finish that it was providing a policy with a coverage cap of $2.5 million. Accordingly, Travelers could not have ratified the mistaken internal communication between the brokers because all of the documents that passed from Travelers to IBSI and from IBSI to Cory correctly stated the relevant liability limits.

Cory's final attempt at establishing liability on the part of Travelers is to argue that Travelers and CCC entered into an oral contract of insurance with liability limits of $7,667,000. We are perplexed by this argument. Cory is putting the cart before the horse. Because Travelers never communicated directly with Cory or CCC, there cannot have been any oral contract unless IBSI was an agent of Travelers. But, if the necessary agency relationship existed between IBSI and Travelers, then Cory's oral contract argument is irrelevant because Cory could proceed under its *respondeat superior* theory of liability. Thus, Cory's argument about the alleged formation of an oral contract is unavailing and would be redundant if it was not.

## IV

It is regrettable in a case of this complexity to require yet more proceedings, but as we have explained, IBSI was entitled to a full trial on the breach of fiduciary claim, as opposed to the abbreviated proceeding it received. On the other hand, for the reasons we have explained, Travelers was entitled to summary judgment on the breach of contract and *respondeat superior* negligence claims. The judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion. Costs on

appeal shall be assessed against IBJ and Cory.


**A true Copy:**

      **Teste:**

                 _____

                 *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*

USCA-02-C-0072—8-29-03